UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| CYNTHIA S. NELMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:09-CV-236 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Cynthia S. Nelms ("Plaintiff") brings this action under 42 U.S.C. § 402(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff disability insurance benefits ("DIB"). Specifically, Plaintiff challenges the decision of an Administrative Law Judge ("ALJ") who found, after a hearing, that Plaintiff was not disabled because she was capable of performing past relevant work at the sedentary level. Plaintiff seeks a determination by the Court that she is disabled. For the reasons stated below, I **RECOMMEND**: (1) Plaintiff's motion for judgment on the pleadings [Doc. 13] be **DENIED**; (2) Defendant's motion for summary judgment [Doc. 17] be **GRANTED**; (3) the decision of Commissioner be **AFFIRMED**; and (4) this action be **DISMISSED WITH PREJUDICE**.

**I.    ADMINISTRATIVE PROCEEDINGS**

In her application for DIB, Plaintiff alleged she had been disabled since May 2, 2006, due to neck pain causing headaches and radiating into her left extremity and lower back pain

"generat[ing]" into her hip, left leg, and foot (Tr. 84, 98). She also alleged obesity, stents, and status post heart attack (Tr. 36). Plaintiff's claim was initially disapproved after a determination that she could still perform her past work as a customer service coordinator (Tr. 36). Her claim was again denied on reconsideration with a similar rationale (Tr. 45). Plaintiff requested a hearing, which was held on February 11, 2009 (Tr. 20-26). The ALJ, by decision dated March 2, 2009, determined Plaintiff was not disabled (Tr. 9-17). On July 7, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (Tr. 1).

## II.    ELIGIBILITY FOR DIB

The Social Security Administration ("SSA") determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). Between steps three and four, the ALJ assesses the claimant's residual functional capacity ("RFC"). *Id.* at 653. The claimant bears the burden to prove the severity of her impairments, but the burden shifts to the Commissioner

2

at step five to show there are jobs she can perform despite her impairments. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## III.   FACTUAL BACKGROUND AND ALJ'S FINDINGS

Plaintiff, who was 57 years old at the time of the hearing, completed her associates degree in psychology before going on to a career in customer service (Tr. 20-21). Plaintiff was a supervisor charged with overseeing 12 other employees, and most of her work was done by telephone (Tr. 22). Plaintiff stopped working sometime in 2005 or 2006[1] during a downsizing in which her job was moved to another state (Tr. 99). Before she was laid off, Plaintiff explained, she was forced by neck and back pain to take "a lot of sick time" and vacation time to attend medical appointments, and she was provided with various ergonomic accommodations by her employer and was allowed to take frequent breaks (Tr. 98-99).

### A.   Plaintiff's Complaints

Plaintiff alleged her back pain began in 2003,[2] and it worsened when she performed activities such as walking, sitting for more than 10 to 15 minutes, vacuuming, bending, climbing, and driving (Tr. 118). Plaintiff's main problem, however, according to her testimony, was neck pain (Tr. 22), which began in 1999 (Tr. 118, 233). She stated her neck pain was "constant" and severe enough to impair her ability to concentrate (Tr. 23, 120), interfered with typing or using a computer, and was

---

[1] The record is not consistent on this point. One physician noted in September, 2005, that Plaintiff was unemployed (Tr. 212); Plaintiff's disability application stated she was laid off in October, 2005 (Tr. 99); and during the hearing, Plaintiff answered a compound question by her attorney suggesting she might have been working as late as 2006 (Tr. 22).

[2] In her application for benefits, Plaintiff stated both her neck and back pain began in 1999 (118, 120), but she told Dennis Ford, M.D., that it began in 2003 after she fell backward (Tr. 211). A medical history apparently written by Plaintiff explains that her neck pain began in 1999 but her back pain began in 2003 (Tr. 233).

3

exacerbated by housework (e.g., lifting or sweeping) and by lifting her arms above her head (Tr. 98, 120). Plaintiff also complained of headaches, which she stated had been diagnosed as secondary to her neck condition (Tr. 110). Plaintiff testified she had to lie down about 15 times per day because of her pain, and sometimes up to 30 or 40 times during a day (Tr. 23). In questionnaires she completed while applying for benefits, Plaintiff stated she took Darvocet, which "dull[ed] the pain" but caused drowsiness, and Tylenol (Tr. 118, 120, 132). At the hearing, she testified she had prescriptions for pain and had received treatment by a pain management specialist, but could not afford to fill those prescriptions or continue pain management treatment because she did not have insurance (Tr. 23-24). Instead, Plaintiff used ice packs and sought chiropractic treatments (Tr. 119). According to Plaintiff, her chiropractor discounted his office visits so that she could continue to see him (Tr. 234).

Plaintiff described her daily activities as making her bed (with her husband's help), preparing meals, and putting dishes into the dishwasher (Tr. 119, 140). She reported no difficulty in caring for her own personal needs, and she also cared for her pets (Tr. 140). Plaintiff sometimes assisted her mother with transportation to the doctor and drug store and with personal grooming (*id.*).

### B.    Treatment History

Plaintiff sought chiropractic treatment from Mark Williams, D.C., beginning in 2002 (Tr. 232, 253). The record contains Dr. Williams' treatment notes only from May, 2006, to December, 2008 (Tr. 242-52, 295-97). Two letters penned by Dr. Williams, however, describe Plaintiff's previous treatment history. The first letter, a request that Plaintiff's insurer approve additional treatments, is dated April, 2002 (Tr. 253). In it, Dr. Williams states that prior to seeking chiropractic treatment, Plaintiff was evaluated by Dr. Craig Humphries, an orthopedic surgeon, who concluded

4

that the degenerative changes in Plaintiff's neck did not warrant surgical fusion at that time and instead recommended stretching and strengthening (*id.*). She was referred for pain management, but both doctors who evaluated her offered only cortisone injections, which she could not tolerate because of a heart condition (*id.*). Dr. Williams stated that Plaintiff's pain and symptoms were sometimes "nearly unbearable" and interfered with her daily activities, but also noted she took only an occasional aspirin for pain and was "making progress" (Tr. 254). Dr. Williams' treatment notes, however, indicate that Plaintiff was able to perform all activities of daily living (Tr. 242-52, 295-97).

By letter dated April, 2007, Dr. Williams reported that Plaintiff first sought chiropractic treatment for complaints of neck and back pain, shoulder pain, and headaches (Tr. 232). Plaintiff's spine was tender to palpitation in several areas (*id.*). Cervical spine x-rays revealed a "complete loss" of the lordotic curve with moderate degeneration of two discs, and lumbar x-rays revealed moderate scoliosis and moderate degeneration of one disc (*id.*). Both Plaintiff's cervical and lumbar spines were "listing left" (*id.*). After attempting to correct Plaintiff's misalignments, Dr. Williams concluded that "it was evident that [her] spinal problems were so chronic and had been in this state for so long that correction and lasting change would not be possible." (*Id.*). Instead, chiropractic treatments provided at best "temporary pain relief" for Plaintiff (*id.*). Two months later, Dr. Williams listed Plaintiff's diagnoses as including cervical radiculitis, cervical disc degeneration, lumbar radiculitis, sciatic neuritis, and lumbar disc degeneration (Tr. 240). He noted that Plaintiff's prognosis was "guarded," and opined that her condition would likely continue to decline (*id.*).

In September, 2005, Plaintiff was seen by Dennis Ford, M.D., a pain management specialist (Tr. 211-213). She presented with complaints of neck and back pain, which worsened with walking, vacuuming, and other chores (Tr. 211). Plaintiff also described previous treatment by a physical

5

therapist and chiropractor (*id.*). She told Dr. Ford that chiropractic treatments helped, though not as much as they originally had, and it took her a week to "get over" the adjustments (*id.*). Dr. Ford noted that a 2004 MRI showed an extruded disc in the lumbar spine. He diagnosed a herniated lumbar disc and prescribed Darvocet (Tr. 213). Dr. Ford also prescribed lumbar internal disc decompression ("IDD") treatments, which Plaintiff began on October 3, 2005 (Tr. 171). At a follow-up appointment on October 5, 2005, Dr. Ford observed that an MRI report from 2000 stated Plaintiff had "multilevel degenerative changes" and an extruded disc in her cervical spine (Tr. 216). Dr. Ford subsequently added "herniated cervical disc" to Plaintiff's diagnoses (Tr. 219). Plaintiff continued with IDD treatments throughout the month of October, ultimately completing a series of 20 such treatments (Tr. 161-200, 201). On October 31, Plaintiff reported that the treatments had helped, but severe back pain returned after she bent to pick up the paper (Tr. 217). Dr. Ford recommended lumbar epidural steroid injections, but Plaintiff told him her cardiologist would not let her have them (Tr. 219).[3]

Overlapping with her treatment by Dr. Ford, between June, 2005, and April, 2007, Plaintiff was treated for various complaints unrelated to neck and back pain by Paul Smith, D.O. (Tr. 225-31). On each occasion, he noted that Plaintiff's neck was supple and not tender (*id.*).

**C.   Medical Opinions**

Thomas Mullady, M.D., performed a consultative examination in August, 2007, on referral from the state agency (Tr. 255). Plaintiff complained of neck pain radiating into her left arm (*id.*). She reported having "difficulty performing yard work, household chores such as vacuuming,

---

[3] Records from Plaintiff's cardiologist do not appear in the record, but Plaintiff reported having two cardiac stents placed (Tr. 211).

sweeping, and mopping, and . . . reaching overhead to wash windows [or] plac[e] things on shelves." (*Id.*). Dr. Mullady noted that Plaintiff was then taking aspirin and ibuprofen for pain (Tr. 256). At 5'1" and 201 pounds, Plaintiff was noted to be moderately obese (Tr. 256-57). During Dr. Mullady's examination of Plaintiff, he also noted a decreased range of motion in her cervical spine, but range of motion in her lumbar spine was within normal limits (*id.*). Dr. Mullady opined that Plaintiff retained the ability to occasionally lift ten pounds but could not frequently lift any amount of weight (Tr. 257). She could stand or walk two hours or sit for about six hours during an eight-hour workday (*id.*).

In October, 2007, James Lester, M.D., reviewed Plaintiff's file and offered a less restrictive assessment. Dr. Lester opined Plaintiff could lift 50 pounds occasionally and 25 pounds frequently (Tr. 259). She could walk or stand for about six hours during a workday and could sit, similarly, for about six hours (*id.*). Dr. Lester found that Plaintiff's complaints were "at least partially credible" but "less than fully credible" based on the objective medical evidence (Tr. 263, 265). He specifically found Dr. Mullady's assessment to be overly restrictive (Tr. 265).

In April, 2008, Lloyd Walwyn, M.D., reviewed Plaintiff's file and offered an assessment of Plaintiff's functional capacity that was substantially identical to Dr. Lester's (Tr. 286-93). Dr. Walwyn agreed that Dr. Mullady's assessment was overly restrictive and that Plaintiff's complaints were only "partially credible" (Tr. 292-93). Explaining his opinion, Dr. Walwyn stated that Plaintiff reported being able to dust, vacuum, load the dishwasher, do laundry, and cook (Tr. 293).

In November, 2007, Dr. Williams offered an opinion based on his treatment of Plaintiff (Tr. 266). He stated that she received temporary relief with chiropractic adjustments, and that x-rays taken in 2005 and 2007 showed her condition was "worsening in both the cervical and lumbar

7

spine." (*Id.*). He opined that she could stand continuously "possibly 30 min[utes]" but could not sit or walk continuously for any length of time (Tr. 267). She could occasionally lift up to ten pounds (*id.*). Plaintiff could never bend, stoop, squat, or walk on uneven surfaces, and could only occasionally kneel, climb stairs, crawl, reach above her shoulders, or use her hands for manipulation (Tr. 268). Bed rest was necessary at times, and Plaintiff needed to elevate her legs between one and one and a half hours per day (Tr. 268-69). Plaintiff's pain adversely affected her ability to concentrate, as did the side effects from her medications (*id.*). Dr. Williams concluded that Plaintiff's "current condition makes it nearly impossible to do even the most minor activities of daily living, and nearly impossible to do any type of work outside the home" (Tr. 266). Specifically, he opined Plaintiff could not reliably attend work without missing more than two days per month (Tr. 272). Dr. Williams affirmed that his opinions were based on objective evidence that, although not necessarily evident on the face of his treatment notes, was nonetheless sufficient to support those opinions (Tr. 270).

Dr. Williams submitted a revised opinion in January, 2009, in which he summarized Plaintiff's impairments as moderate scoliosis, "extremely bad" in the lumbar spine, moderate to severe disc degeneration in the cervical and lumbar spine, and reversal of the normal lordotic curve in the cervical spine (Tr. 299). The opinion differed from his 2007 assessment in several respects: Plaintiff could lift only five pounds occasionally (not ten) (*id.*). She could "never" bend, stoop, squat, kneel, climb stairs, crawl, reach above her shoulders, or walk on uneven surfaces (as opposed to "occasionally" being able to perform some of those postures) (Tr. 300). And she could "continuously" use her hands for manipulation (as opposed to "occasionally") (*id.*). Plaintiff did not require daily bedrest and did not need to elevate her legs (*id.*). She was not taking medicine that

8

affected her ability to concentrate, but her pain impaired her concentration (Tr. 300-01).

**D.     Vocational Expert's Testimony**

The Vocational Expert ("VE") classified Plaintiff's previous work in customer service as skilled, sedentary work (Tr. 25). The ALJ asked the VE two hypothetical questions about an individual with Plaintiff's age and work experience (*id.*). If such a person needed to lie down several times during a day, as Plaintiff testified, the VE testified she would not be capable of performing any jobs (*id.*). In addition, the ALJ fashioned a hypothetical question based roughly on the 2009 opinion of Dr. Williams: the individual could lift only one to five pounds and could not bend, squat, kneel, climb, reach, or walk on uneven surfaces, had low stamina and endurance, experienced severe pain affecting her concentration, and needed to take three breaks during the day (*id.*). Those restrictions, the VE testified, would preclude that individual from performing any work (*id.*).

**E.     ALJ's Findings**

At step one, the ALJ found that Plaintiff had not engaged in gainful activity since the date of her application (Tr. 11). At step two, the ALJ found that Plaintiff had several severe impairments, including degenerative disc disease of the cervical and lumbar spine, sciatic neuritis, and coronary artery disease (*id.*). The ALJ concluded at step three, however, that none of Plaintiff's impairments was severe enough to meet any listing (Tr. 13). The ALJ then evaluated Plaintiff's RFC and found she was able to perform the full range of semi-skilled and skilled sedentary work. In reaching this finding, the ALJ gave great weight to the opinion of Dr. Mullady, the examining consultant (Tr. 15), but did not give considerable weight to the opinions of Drs. Lester and Walwyn because they did not examine Plaintiff or hear her oral testimony (Tr. 16). Of particular importance here, the ALJ

declined to fully credit Dr. Williams' opinion and found that Plaintiff's subjective account of her impairments was not credible (Tr. 14-15). Finally, at step four, the ALJ observed that Plaintiff's past relevant work in customer service fell within the skilled sedentary occupational base and therefore concluded Plaintiff could perform that work (Tr. 16). Accordingly, he found Plaintiff was not disabled (Tr. 16-17).

## IV.   ANALYSIS

Plaintiff challenges the ALJ's decision on two grounds. First, she argues the ALJ failed to give sufficient weight to the opinion of Dr. Williams. Second, she contends the ALJ's finding that she was not credible, inasmuch as it was based on her reported daily activities, was error because those activities actually supported her complaints rather than undermining them.

### A.   Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court

may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.     Opinion of Dr. Williams**

Plaintiff concedes that Dr. Williams is not an "acceptable medical source," and that his opinion is not entitled to the weight usually afforded treating physicians. *See* Social Security Ruling ("SSR") 06-03p. Nonetheless, Plaintiff points out, opinions of "other sources" are entitled to weight commensurate with (1) the frequency of treatment, (2) consistency with other record evidence, (3) the degree to which the source supports the opinion with relevant evidence, (4) how well the source explains the opinion, and (5) the specialty of the source. *Id.* Plaintiff argues the ALJ failed to consider these factors and rejected Dr. Williams' opinion simply because he is a chiropractor, not

a medical doctor. Thus, Plaintiff continues, the ALJ failed to give Dr. Williams' opinion the weight it was due as an "other source." Relatedly, and citing no authority, Plaintiff argues that the failure of the ALJ to address the five factors listed in SSR 06-03p in his written decision is reversible error.

Initially, the proposition that a procedural failure to discuss each of the SSR 06-03p factors is reversible error, as a legal matter, is incorrect. *Cf. Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (approving ALJ's decision rejecting treating physician opinion even though the written explanation did not address all the factors). More important, the ALJ did in fact discuss all but one of the SSR 06-03p factors when discussing Dr. Williams' opinion. To be sure, the ALJ observed that Dr. Williams, unlike Dr. Mullady, is not a medical doctor (Tr. 15), but that distinction is supported by the Social Security Administration's regulations. The two types of sources are treated quite differently, *see* 20 C.F.R. § 404.1513; SSR 06-03p, and it was not improper for the ALJ to comment on the difference. Indeed, noting that Dr. Williams is a "treating chiropractor" is an explicit consideration of the fifth factor--"[w]hether the source has a specialty or area of expertise related to the individual's impairment(s)."

The ALJ also explained that Dr. Williams' opinions were "not fully supported by the objective findings found in the record, or the findings of the consultative physician" (Tr. 15). This finding touches on the second factor--the consistency of the opinion with other evidence--and it is supported by substantial evidence. First, Dr. Williams' statement that Plaintiff's spine was tender to palpitation (Tr. 232) is somewhat inconsistent with Dr. Smith's repeated observations that Plaintiff's neck was not tender (Tr. 225-31). Second, Dr. Williams' assessment was at odds with that of Dr. Mullady. Dr. Williams, for example, opined that Plaintiff could not sit or walk for any amount of time during a workday (Tr. 267), but Dr. Mullady opined she could sit for about six hours

12

and walk for at least two hours (Tr. 257). Third, Dr. Williams' opinion was at odds even with his own treatment notes. His opinion stated that Plaintiff's pain made it "nearly impossible" for her to perform "even the most minor activities of daily living," (Tr. 266) but his treatment notes consistently stated she was able to perform all activities of daily living (Tr. 242-52, 295-97).

Last, the ALJ explained he rejected Dr. William' opinion because it appeared to be "based on the claimant's complaints (Tr. 15). That finding is also supported by substantial evidence. Dr. Mullady's opinion was based on a physical examination of Plaintiff which revealed normal range of motion in the lumbar spine and normal gait and muscle strength (Tr. 256-57), while Dr. Williams' opinion did not specify what physical findings supported his assessment of her impairments. Notwithstanding Dr. Williams' assertion that his opinion was based on objective evidence, his opinion did not connect the dots between objective evidence and his functional assessment, leaving the ALJ to conclude, reasonably, that Dr. Williams was merely reporting Plaintiff's subjective complaints. Thus, the ALJ's explanation also touches on the third and fourth factors of SSR 06-03p--"[t]he degree to which the source presents relevant evidence to support an opinion" and "[h]ow well the source explains the opinion . . . ."

Only one factor remains: the length and frequency of the treatment relationship. Here, it appears the ALJ did err. The ALJ stated that Dr. Williams treated Plaintiff from April, 2007, to December, 2008, when in fact the treating relationship began in 2002, and Dr. Williams' treatment notes go back as far as April, 2006 (Tr. 12, 232, 244). I **CONCLUDE** this error was harmless, however, because the ALJ did not cite the length of the treating relationship as a reason to reject Dr. Williams' opinion, and the reasons he did cite were substantial.

In sum, I **FIND** the ALJ did not reject Dr. Williams' opinion merely because he is a

13

chiropractor, but offered other legally sufficient reasons, supported by substantial evidence, for affording that opinion less than controlling weight. In addition, while he found that Dr. Williams' opinion was not "fully" supported by the record, the ALJ also found it "reasonable to assume the claimant has some of the limitations" assessed by Dr. Williams, and he incorporated those limitations into his RFC finding by limiting Plaintiff to sedentary work (Tr. 15-16). I **FIND** the ALJ reasonably weighed the opinions in the record when assessing Plaintiff's RFC.

### C. Plaintiff's Credibility

Plaintiff also challenges the ALJ's rejection of her testimony. Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (ALJ's credibility assessment is entitled to substantial deference). The ALJ found Plaintiff's testimony incredible for two reasons: "the absence of significant objective and laboratory medical findings which provide confirmation of impairments that could reasonably be expected to cause the subjective complaints" and Plaintiff's "reported activities of daily living" (Tr. 15).

14

1. **Daily Activity Evidence**

Explaining the latter rationale, the ALJ stated that "the claimant reported to the consulting physician that she experienced *difficulty* performing yard work and household chores such as vacuuming, sweeping, mopping, and reaching overhead to wash windows or place items on shelves (Tr. 255) (emphasis added). It is unclear whether Plaintiff was reporting that she routinely performed these chores (albeit with difficulty) or that she was unable to perform these chores because of her difficulties. Plaintiff, of course, prefers the latter reading. Whatever Plaintiff intended by the statement, I **FIND** it too ambiguous to provide substantial support for the ALJ's adverse credibility finding.

This ambiguous statement, however, was not the only report of Plaintiff's daily activities cited by the ALJ. Answering a questionnaire in support of her application for benefits, Plaintiff stated she performed "limited" household chores: making the bed (with the help of her husband), laundry, preparing supper, and loading the dishwasher (Tr. 137). In addition, although the ALJ did not mention it, Dr. Williams' treatment notes consistently showed Plaintiff was able to perform all activities of daily living (Tr. 242-52, 295-97). Furthermore, she was able to care for her own personal needs and tend to her pets, and she even assisted her mother with transportation and personal care (Tr. 140). A claimant's daily activities may undermine her credibility to the extent they are inconsistent with her testimony. *Compare Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (claimant's activities of washing dishes, light cooking, laundry, reading, bathing, traveling to a national park, shopping, spending time with friends, and attending church were inconsistent with her allegations of total disability) *with Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) (claimant's ability to perform chores on an intermittent basis was not substantial evidence

15

of his ability to work on a full-time basis).  I **FIND** Plaintiff's description of her daily activities to be inconsistent with her testimony that she is incapable of working because she must lie down as often as 30 to 40 times per day (Tr. 23).  I therefore **FIND** those activities to be substantial evidence for the ALJ's rejection of Plaintiff's testimony.

### 2. Absence of Objective Findings

Furthermore, even if Plaintiff's daily activities were not sufficient to support the credibility finding, the ALJ's alternate rationale--the absence of other evidence confirming Plaintiff's subjective complaints--provides further support for his decision.  As noted above, the ALJ properly discounted the opinion of Dr. Williams.  Other than Dr. Williams' treating source statements, there were three functional assessments in the record, all of which were consistent with at least sedentary work.  They were not consistent, however, with Plaintiff's allegations.  Of those, the ALJ gave greatest weight to Dr. Mullady's, which was the most restrictive, because he examined Plaintiff and supported his assessment with clinical findings.  I **FIND** the evaluation of Dr. Mullady to be substantial evidence that Plaintiff's subjective complaints were not as great as she claimed.

## V. CONCLUSION

For the foregoing reasons, I **CONCLUDE** the ALJ properly considered Dr. Williams' opinion and properly discredited Plaintiff's testimony.  Accordingly, I **RECOMMEND:**[4]

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

(1)  Plaintiff's motion for judgment on the pleadings [Doc. 13] be **DENIED**.

(2)  Defendant's motion for summary judgment [Doc. 17] be **GRANTED**.

(3)  The Commissioner's decision denying benefits be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**.

                                      *s/Susan K. Lee*
                                      SUSAN K. LEE
                                      UNITED STATES MAGISTRATE JUDGE